Argued and submitted May 1, affirmed as modified October 30, 1984

WEIGEL,
*Respondent on Review,*

*v.*

RON TONKIN CHEVROLET CO.,
*Petitioner on Review.*

(A8106-03272; CA A25638; SC S30373)

690 P2d 488

Barbee B. Lyon, Portland, argued the cause and submitted

briefs for Petitioner on Review. With him on the briefs were Janet C. Neuman and Tonkon, Torp, Galen, Marmaduke & Booth, Portland.

James R. Carskadon, Jr., Milwaukie, argued the cause and submitted briefs for Respondent on Review. With him on the briefs were John H. Kelley and Redman, Carskadon, Knauss & Kelley, Milwaukie.

Before Peterson, Chief Justice, and Lent, Linde, Campbell, Roberts and Carson, Justices.

LINDE, J.

## LINDE, J.

■ The Unlawful Trade Practices Act makes it an unlawful practice for a person to represent in the course of business "that real estate or goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used or second-hand." ORS 646.608(1)(f). The chief issue in the present case is whether an automobile dealer violated this provision in selling as new a car that an earlier customer conditionally contracted to buy and took home but returned for lack of financing. We hold that an automobile is "used" rather than "new" within the meaning of the statute when a dealer previously has given any person legal possession of the automobile for that person's discretionary use for his or her own purposes beyond the limited purpose of a try-out before a contemplated purchase. Other issues are whether plaintiff showed the "ascertainable loss of money or property" required for recovery under the statute and aggravated circumstances justifying punitive damages.

We take the summary of the facts from the opinion of the Court of Appeals:

> "In March, 1981, plaintiff purchased a car from defendant. It was represented as new, although it had approximately 260 miles on its odometer. When plaintiff questioned that mileage, he was told by defendant that the car had been driven from southern Oregon as part of a dealer trade. Plaintiff received an original title, license and registration and a new car rebate and warranty. A month later, plaintiff brought the car back for service. He then learned that it had been conditionally sold and delivered previously to a third person, Hubbard. Hubbard had signed a purchase order and had kept the car for five days, putting 200 miles on the odometer before returning it to defendant because she could not obtain the necessary financing."

*Weigel v. Ron Tonkin Chevrolet Co.,* 66 Or App 232, 234, 673 P2d 574 (1983). The jury awarded plaintiff $200 in general damages and $10,000 in punitive damages.

### I.

What ORS 646.608(1)(f) forbids is the representation that goods are "original or new" if they are, among other things, "used or second-hand."

■■    What is meant by the words "new" and "used" is a question of statutory interpretation. It is not a question for a factfinder to decide case by case, with the possibility that different results might be reached on identical facts.[1] There are decisions to the contrary. *See, e.g., Jack Criswell Lincoln Mercury, Inc. v. Haith,* 590 SW2d 616 (Tex Civ App 1979), holding that a claim under the statute should be submitted to the jury upon plaintiff's testimony that he considered an automobile that had been driven 660 miles to be a used car. A Kansas court reached an apparently similar result in *Watkins v. Roach Cadillac, Inc.,* 7 Kan App 8, 637 P2d 458 (1981), but the Kansas statute differs by adding a requirement that the goods be "used to an extent that is materially different from the representation." Without such a requirement of factual or material difference, what is a "new" or "used" automobile within the meaning of a statute distinguishing dealings in "new" and "used" goods, on a given state of facts, is a question of law, not of jury opinion.

The answer turns on at least two elements. One is the significance of actual, physical "use" of the automobile. The other element is the significance of prior transactions involving the same vehicle. Both are important.

Doubtless the legislature did not intend an automobile to become "used" goods as soon as it is driven. Legislatures must be assumed to know that many new automobiles are driven some distance to the showroom or sales lot of the retail dealer, and that sales personnel and potential customers drive new automobiles in the course of considering a purchase. An automobile does not become a "used" car because several potential buyers have driven it solely for that purpose any more than a coat becomes used clothing because several customers have tried it on in the clothing store. Misrepresentation of the mileage accumulated during such trial drives is a separate matter, but in this case the mileage was accurately stated to plaintiff.

It is equally improbable that the legislature intended an automobile to become "used" goods by a mere paper transaction, later revoked, without being driven at all. This

---

[1] Whether a representation that an item is "new" is a misrepresentation may be a jury question in a common law fraud action, *see Krause v. Eugene Dodge, Inc.,* 265 Or 486, 504-05, 509 P2d 1199 (1973), but here we are interpreting the legislature's use of the terms.

might happen whenever a customer orders a particular model and completes all steps in the sale (or lease), including payment, but the parties rescind the sale, perhaps in order to substitute a different model, by the time the ordered vehicle is delivered or even reaches the dealer. The prior sales contract alone cannot satisfy the statutory concept of "used" goods; actual use at least to the extent of taking possession is required.

■   We therefore do not accept the emphasis that defendant would place on the question whether a sale had been completed in this case. Nor does the result depend on the kind of warranty given with the vehicle or how the prior transaction was treated for purposes of the dealer's inventory and financing practices. Merchandise other than automobiles sometimes is sold, examined or tried out at home, and returned to the seller. Whether such merchandise is "new" or "used" does not depend on the fact of an earlier sale; it depends on whether the article was used. In the case of automobiles, moreover, the test cannot be confined to prior sales; doubtless the statute encompasses prior use under a lease, a loan, or by the dealer himself as a personal or business vehicle beyond the narrow uses involved in moving the merchandise to the dealer's place of business, testing or servicing it, and demonstrating it in the sales process. If an automobile has been physically used by anyone for purposes beyond the uses incidental to the sales process, that fact must be disclosed.[2] If the nature of the prior use is fully disclosed to a buyer, there is no actionable misrepresentation regardless whether the automobile is sold on terms otherwise employed for "new" cars.

## II.

The prior transaction involving the automobile sold to plaintiff, including its undisclosed use by Hubbard, appears

---

[2] Defendant cites ORS 481.070(1) which defines "Used vehicle" for purposes of Motor Vehicles Division Law as follows:

"(1) 'Used vehicle' means any motor vehicle, trailer or semitrailer which has been sold, bargained, exchanged, given away or has had its title transferred from the person who first took out title to it from the manufacturer or importer or the person's dealer or agent, and so used to have become what is commonly known as 'second handed' within the ordinary meaning thereof."

Without here deciding any issue under that statute, we believe it is consistent with our interpretation of ORS 646.608(1)(f) as applied to the sale of vehicles.

to make the automobile "used" rather than "new" as a matter of law. It does not matter exactly how far the earlier transaction had progressed as a legal transfer of ownership, if in fact defendant transferred possession of the automobile to Hubbard for her discretionary personal use rather than for a limited tryout and she so used it for five days before returning it for lack of financial capacity to carry out the negotiated purchase. If the events are disputed, they must, of course, be submitted to a factfinder under proper instructions.

The case, however, was submitted to the jury on a different theory of the statute. After plaintiff had presented his case, the trial court ruled that defendant was entitled to sell the automobile as a "new" car. Nevertheless, the court denied defendant's motion for a directed verdict and later instructed the jury as follows:

> "As a matter of law a car dealer can sell as new, under the law, a vehicle that has not had its financing completed, and has been sold on that type of basis, because as you know the transaction has not been completed. It was conditional on its face.
>
> "However, that does not answer the question as to whether the dealer has the further responsibility in selling such a vehicle as a new vehicle to represent to the purchaser the history of the vehicle and that is what we leave to you as jurors to determine — whether there has been a violation of the Unfair Trade Practices Act in that respect.
>
> "They have a legal right to sell it as new, but then do they have a further obligation, and then to answer that question as a fact question you are going to have to review that law as I gave it to you, determine what representations were or were not made. Determine whether they are actionable. Determine whether they caused any damage and, finally determine were they so aggravated as to justify you in returning punitive damages. That's it in a nutshell."

The court also told the jurors that their task was "to tell us from a community standard, since you represent the community, whether there has been a violation of the Act or not."

When a juror stated his understanding of the instructions to be that "[o]ur decision on the law is based on whether it is in our opinion legal or not, legal for a dealer to not tell the history of the vehicle," the court responded: "Within the meaning of the law." In answer to another juror's question,

the court also repeated that it was legal to sell the car as new, but "that still does not answer the question in respect to, is there a violation of the Unfair Practices Act."

In view of our interpretation of the statute, these instructions were inaccurate. If the automobile had been turned over to Hubbard for her unrestricted personal use, it could not be sold to plaintiff as "new" without disclosure of that fact, and whether doing so violated the statute was not for the jury to determine by a "community standard." The question is whether the error was prejudicial.

According to plaintiff, the instruction that defendant legally could sell the car as "new" was adverse to plaintiff and could not harm defendant. The Court of Appeals accepted this argument. 66 Or App at 236. Defendant reads the court's opinion to state that it was for the jury to decide whether it was a misrepresentation to sell this automobile as "new." Defendant therefore contends in this court that if this is correct, defendant should have an opportunity to argue this factual issue to a jury, because the first jury was not instructed to and did not decide it.

There would be logic to defendant's contention but for our holding, contrary to that of the Court of Appeals, that the automobile was "used" as a matter of law if in fact it had been turned over to Hubbard for her personal use in a manner not restricted to a tryout in contemplation of a potential purchase. Defendant does not claim that this fact was disputed and not decided by the jury, or decided under erroneous instructions. In the absence of such a dispute, defendant is not entitled to a new trial on this issue.

### III.

Civil recovery under ORS 646.638 requires that the defendant's commission of an unlawful trade practice must be "wilful" and result in an "ascertainable loss of money or property" to plaintiff. Defendant contends that plaintiff's evidence does not satisfy the second requirement.

What the legislature meant by an "ascertainable loss of money or property" is not free from doubt. The case was tried on the theory that a plaintiff must show an economic loss in the sense of a difference between the price paid and some objective measure of market value. This is one plausible

reading of the statute, but it is not the only one. Another possible reading is that the legislature meant to exclude a civil action by a customer who was attracted by a forbidden misrepresentation but in fact did not act upon it, or who received immediate satisfaction at no expense when bringing the matter to the seller's attention, yet that a "loss of money or property" includes the expenditure of funds for goods that are not as desired by the customer and represented by the seller irrespective of their market value to others. We therefore invited the parties to submit additional memoranda on this question.[3]

The overall structure of the Unlawful Trade Practices Act lends some support to the second view of the legislative policy. The act provides for both public and private enforcement. It authorizes district attorneys to seek injunctions against an unlawful trade practice, ORS 646.632, which are enforceable by statutory penalties, ORS 646.642, and possible loss of licenses and franchises, ORS 646.646.

■ The civil action authorized by ORS 646.638 is designed to encourage private enforcement of the prescribed standards of trade and commerce in aid of the act's public policies as much as to provide relief to the injured party. This is apparent from the section itself.[4] It allows recovery of actual

---

[3] Our question included two illustrations:

"To illustrate the first possibility, assume that a person orders and pays for merchandise on the representation that it is unique (e.g., a buyer who wants assurance that the dealer has not sold the same model of car—or jewelry or other merchandise—in the identical color), or orders and pays for golf clubs represented to be lefthanded but righthanded clubs are delivered and not exchanged. Has such a buyer suffered a loss of money regardless of whether the property may be worth the price or more than the price to another buyer? In other words, was the purpose of the statutory requirement to allow a civil action only if a person bought merchandise or otherwise entered into a transaction on the strength of the unlawful trade practice, but not to allow an action by a person who did not act upon the misrepresentation or other unlawful practice?"

[4] ORS 646.638:

"(1) Any person who suffers any ascertainable loss of money or property, real or personal, as a result of wilful use or employment by another person of a method, act or practice declared unlawful by ORS 646.608, may bring an individual action in an appropriate court to recover actual damages or $200, whichever is greater. The court or the jury, as the case may be, may award punitive damages and the court may provide such equitable relief as it deems necessary or proper.

"(2) Upon commencement of any action brought under subsection (1) of this section the party bringing the action shall mail a copy of the complaint or other initial pleading to the Attorney General and, upon entry of any judgment or decree

damages or $200, whichever is greater, plus punitive damages, costs, and attorney fees. It requires a plaintiff to notify the Attorney General when filing a complaint, or plaintiff cannot obtain entry of judgment. The action must be commenced within one year rather than the longer periods ordinarily allowed for civil actions, and it is expressly made additional to other common law or statutory remedies. The evident purpose is to encourage private actions when the financial injury is too small to justify the expense of an ordinary lawsuit, provided that the action is timely initiated while the unlawful practice may be continuing and that the state is given an opportunity to investigate the practice for possible wider enforcement action.[5]

All of this suggests that in enacting ORS 646.638, the legislature was concerned as much with devising sanctions for the prescribed standards of trade and commerce as with remedying private losses, and that such losses therefore

---

in the action, shall mail a copy of such judgment or decree to the Attorney General. Failure to mail a copy of the complaint shall not be a jurisdictional defect, but no judgment shall be entered for the plaintiff until proof of mailing is filed with the court. Proof of mailing may be by affidavit or by return receipt of mailing.

"(3) In any action brought by a person under this section, the court may award, in addition to the relief provided in this section, reasonable attorney fees at trial and on appeal and costs. If the defendant prevails, the court may award reasonable attorney fees at trial and on appeal and costs if it finds the action to be frivolous.

"(4) Any permanent injunction or final judgment or order of the court made under ORS 646.632 or 646.636 shall be prima facie evidence in an action brought under this section that the respondent used or employed a method, act or practice declared unlawful by ORS 646.608, but an assurance of voluntary compliance, whether or not approved by the court, shall not be evidence of such violation.

"(5) Actions brought under this section shall be commenced within one year from the discovery of the unlawful method, act or practice. However, whenever any complaint is filed by a prosecuting attorney to prevent, restrain or punish violations of ORS 646.608, running of the statute of limitations with respect to every private right of action under this section and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof.

"(6) Notwithstanding subsection (5) of this section, in any action brought by a seller or lessor against a purchaser or lessee of real estate, goods or services, such purchaser or lessee may assert any counterclaim the purchaser or lessee has arising out of a violation of ORS 646.605 to 646.652."

[5] The private enforcement section was taken verbatim from the Council on State Governments' *Suggested State Legislation (1970).* The Council's Commentary at 144 indicates that the $200 minimum, punitive damages, and attorneys fees provisions were originally suggested by Rice, *Consumer Transaction Problems,* 48 Boston UL Rev 559 (1968), as methods of motivating suits by typical small-scale victims.

should be viewed broadly. The private loss indeed may be so small that the common law likely would reject it as grounds for relief, yet it will support an action under the statute. In *Crooks v. Payless Drug Stores,* 285 Or 481, 592 P2d 196 (1979), plaintiff recovered the statutory $200 because he had been charged $2.89 for a razor which by an error had been advertised at 89 cents.

Other courts have taken divergent views of the requirement of ascertainable loss. Defendant cites *Bartner v. Carter,* 405 A2d l94 (Me 1979), which denied recovery under Maine's Unfair Trade Practices Act to purchasers of land who found that they received less land than the sellers had represented. The Supreme Judicial Court concluded that the Maine statute provided an action "for restitution" only in the "technical sense" of recovering benefits gained by the seller, not in the sense of making the plaintiff whole, but the court reached this conclusion because the Maine legislature had substituted the word "restitution" for the word "damages" in adopting the Massachusetts act. 405 A2d at 202-03.[6] That change does not appear in the Oregon law. The Supreme Court of Connecticut, on the other hand, allowed recovery of damages to buyers of an automobile that did not meet advertised specifications without requiring plaintiffs to prove a specific amount of actual damages. *Hinchcliffe v. American Motors Corporation,* 184 Conn 607, 440 A2d 810 (1981). The Court concluded that ascertainable "loss" encompassed a broader meaning than the term "damage." It wrote:

> "Whenever a consumer has received something other than what he bargained for, he has suffered a loss of money or property. That loss is ascertainable if it is measurable even though the precise amount of the loss is not known. CUTPA is not designed to afford a remedy for trifles. In one sense the buyer has lost the purchase price of the item because he parted with his money reasonably expecting to receive a particular item or service. When the product fails to measure up, the

---

[6] "According to the principal draftsman of G.L. c. 93A, §9, the 'sole purpose' of the requirement that the plaintiff suffer loss of money or property 'is to guard against vicarious suits by self-constituted private attorneys general when they spot an apparently deceiving advertisement in the newspaper, on television or in a store window.' Rice, New Private Remedies for Consumers: The Amendment of Chapter 93A, 54 Mass.L.Q. 307,314 (1969)." *Baldassari v. Public Finance Trust,* 369 Mass 33, 46, 337 NE2d 701 (1975), *quoted in* 405 A2d at 202.

consumer has been injured; he has suffered a loss. In another sense he has lost the benefits of the product which he was led to believe he had purchased. That the loss does not consist of a diminution in value is immaterial although obviously such diminution would satisfy the statute. To the consumer who wishes to purchase an energy saving subcompact, for example, it is no answer to say that he should be satisfied with a more valuable gas guzzler." 440 A2d at 814.

*See also Mayhall v. A.H. Pond Co., Inc.,* 129 Mich App 178, 341 NW2d 268 (1983), holding that frustration of a buyer's expectations is a "loss" under similar Michigan statutes. Our own precedent, *Scott v. Western Int. Sales, Inc.,* 267 Or 512, 517 P2d 661 (1973), did not decide whether an objective "diminution in value" is required, because the court there "inferred" that a tent lacking certain features would have a value below the price that was charged upon a representation that included these features.

■　　　Scrutiny of the record reveals that the present case also does not turn on the question whether any objective loss in market value is required. There is evidence besides plaintiff's own testimony that the automobile would have suffered a reduction in value if its prior "use" by a hopeful but unsuccessful customer had been disclosed. Defendant's salesman was asked: "If the vehicle was found to be a used vehicle, would it still be your testimony that it would have depreciated in value to some extent?", and he answered the question in the affirmative. Defendant, of course, denied that the car was a "used vehicle," but since under Parts I and II of this opinion it was "used" as a matter of law, the salesman's testimony was additional evidence that the required disclosure of the prior use would have depreciated its value to some extent. Even if the difference in value fell far short of the $1000 asserted by plaintiff, it would suffice for some ascertainable loss of money or property, and allow a court or jury to award the statutory $200 in general damages. *See Crooks v. Payless Drug Stores, supra.*

## IV.

　　　Defendant also contended that the trial court should not have submitted an issue of punitive damages to the jury because there was insufficient evidence of intentional misrepresentation to support such damages. The Court of

.. 

Appeals rejected this contention without detailed discussion.

█        Defendant relies on this court's holding in *Crooks v. Payless Drug Stores, supra,* that punitive damages were meant to be awarded under the Unlawful Trade Practices Act only if they would be available under the common law for punitive damages in tortious business transactions. This does not necessarily require intentional commission of fraud or another tort. Recklessness may suffice, as in making a false representation with the awareness that one does not know its truth or falsity. *See Otte v. Ron Tonkin Chevrolet Co.,* 264 Or 265, 274-75, 503 P2d 716 (1973), involving the sale of a car misrepresented as not previously sold, in which this court sustained an award of punitive damages on instructions covering a misrepresentation made "wantonly" or "so recklessly as to imply a disregard of social obligations." *See also Young v. Goodyear Service,* 244 S C 493, 137 SE 2d 578, 582 (1964) (punitive damages for misrepresentation of washing machine as new did not depend on knowing falsehood.)

It does not follow, however, that in every case of reckless misrepresentation the question of punitive damages may be submitted to the jury. We dealt with that issue in *Schmidt v. Pine Tree Land Dev.,* 291 Or 462, 631 P2d 1373 (1981). There an enterprise was charged with "recklessness" in not preventing salesmen from selling previously sold property, though the individual salesman might be unaware of that fact. We noted that the function of punitive damages in penalizing harmful acts done with bad motives differed from their function in deterring enterprises from "accepting the risks of harm to other private or public interests by recklessly substandard methods of operation at the cost of paying economic compensation to those who come forward to claim it." 291 Or at 466. But we stated that to justify punitive damages such a method of operation

> "must go beyond mere carelessness to a willful or reckless disregard of risk of harm to others of a magnitude evincing a high degree of social irresponsibilty. In such a setting the plaintiff whose economic loss may be insignificant to the enterprise and perhaps too small to justify the expenses of pressing a claim represents social interests larger than his own." *Id.*

That also is the theory of civil recovery under the

Unlawful Trade Practices Act. The act includes under "wilful violations" those in which the person committing the violation should have known that his conduct was a violation, but this court has interpreted the act as not allowing punitive damages for reckless but unintentional violations that do not meet this standard of aggravated social irresponsibility. *Chamberlain v. Jim Fisher Motors, Inc.*, 282 Or 229, 237-38, 578 P2d 1225 (1978).[7]

Plaintiff does not claim punitive damages for reckless violation of the act under aggravating circumstances; he contends that this case differs from *Crooks* and *Chamberlain* because defendant engaged in "calculated and deliberate concealment," that is to say, an intentional violation. But the case was not submitted to the jury on that theory. The trial court instructed the jury that defendant could be found to have committed a willful violation of the act upon "proof of negligence by a defendant in not knowing, when it should have known that a representation made by it through its employees was not true." See ORS 646.605(9).[8]

---

[7] The coupling of a tort committed with a bad motive, or "wantonly, maliciously, or wickedly," as a basis for punitive damages, with a tort committed "so recklessly as to imply a disregard of social obligations," goes back to *Day v. Holland,* 15 Or 464, 469, 15 P 855 (1887).

In recent cases, it has become customary to recite some version of the formula that punitive damages are allowed when the violation of societal interests is sufficiently great or aggravated and the conduct involved is of a kind that sanctions would tend to prevent. *See, e.g., Milliken v. Green,* 283 Or 283, 286, 583 P2d 548 (1978); *Starkweather v. Shaffer,* 262 Or 198, 207, 497 P2d 358 (1972); *McGill v. Huling Buick Company,* 259 Or 413, 419, 487 P2d 656 (1971); *Noe v. Kaiser Foundation Hospital,* 248 Or 420, 435 P2d 306 (1967). The smoothness of the formula as an analysis of the factors bearing on punitive damages is deceptive. "Aggravated" violations, focusing on the quality of defendant's conduct, do not equate with the magnitude of "great societal interests"; and societal interests, in turn, do not literally equate with one's "social obligations," which may run to individuals and have no wider impact. Nor is it beyond dispute, as a matter of social behavior, when punitive damages can or cannot be expected to deter different kinds of tortious conduct.

The punitive or vindicative role and the deterrent role of punitive damages therefore may differ between torts committed in the pursuit of business or other self-interested objectives and in violent assault, trespass, or other personal torts. *See McElwain v. Georgia-Pacific Corp.,* 245 Or 247, 421 P2d 957 (1966); *Fisher v. Carlin,* 219 Or 159, 346 P2d 641 (1959). *See generally* Peters, *Punitive Damages in Oregon,* 18 Will L Rev 369 (1982). *See also 2-D's Logging v. Weyerhaeuser,* 53 Or App 677, 632 P2d 1319 (1981).

[8] ORS 646.605(9) provides:

"(9) A wilful violation occurs when the person committing the violation knew or should have known that his conduct was a violation."

■ ■ This instruction was immediately followed by the court's instruction on punitive damages, including the element of "grievous violation of societal interests." The instructions negate plaintiff's reliance on a theory of intentional misrepresentation to sustain the award of punitive damages. Under the instructions, it is equally possible that the jury found only a reckless or indeed only a negligent misrepresentation. If it was reckless, some showing of systematic or otherwise aggravated conduct evincing a high degree of social irresponsibility was needed. *Schmidt v. Pine Tree Land Dev.,* *supra; Crooks v. Payless Drug Stores, supra; Chamberlain v. Jim Fisher Motors, supra; Otte v. Ron Tonkin Chevrolet Co., supra.* As noted above, plaintiff relies on no such showing but rather on a predicate of intentional misrepresentation that the jury did not necessarily find to have occurred. The judgment must be modified to eliminate the award of punitive damages.

Judgment affirmed as modified by elimination of punitive damages.