225 P.3d 929 (2010)
Martin SCHNALL, a New Jersey resident; Jeananne Aguirre; Nathan Riensche, a Washington resident; Kelly Lemons, a California resident, individually and on behalf of all the members of the class of persons similarly situated, Respondents,
John Girard, a California resident; Sean O'Day, a Florida resident, Plaintiffs,
v.
AT & T WIRELESS SERVICES, INC., a domestic corporation, Petitioner.
No. 80572-5.
Supreme Court of Washington, En Banc.
Argued October 28, 2008.
Decided January 21, 2010.
As Corrected February 9, 2010.
*932 Michael Edward Kipling, Kipling Law Group PLLC, Seattle, WA, for Petitioner.
Daniel Foster Johnson, David Elliot Breskin, Breskin Johnson & Townsend PLLC, Seattle, WA, William Walter Houck, Attorney at Law, Issaquah, WA, for Respondents.
Shannon E. Smith, Office of the Attorney General, Seattle, WA, for Amicus Curiae on behalf of Attorney General of Washington.
Stephen Michael Rummage, Fred B. Burnside, Davis Wright Tremaine LLP, Seattle, WA, Robin S. Conrad, Nat'l Chamber Litigation Center, Washington, DC, for Amicus Curiae on behalf of Chamber of Commerce of the United States of America.
Kelby Dahmer Fletcher, Peterson Young Putra, Seattle, WA, Bryan Patrick Harnetiaux, Attorney at Law, Spokane, WA, for Amicus Curiae on behalf of Washington State Trial Lawyers Assoc., Washington State Association for Justice Foundation.
Seth Leslie Cooper, Attorney at Law, Fairfax, VA, Micah Louise Balasbas, Attorney at Law, Tacoma, WA, for Amicus Curiae on behalf of American Legislative Exchange Council.
Stephen Michael Rummage, Davis Wright Tremaine LLP, Paul J. Lawrence, K & L Gates LLP, Seattle, WA, for Amicus Curiae on behalf of Amazon.com, Clearwire Corporation, Microsoft Corporation, T-mobile USA, Inc.
MADSEN, C.J.
¶ 1 This case asks our court to decide whether Washington will believe the trial court did not abuse its discretion by declining to certify such a class. To the extent a class action is feasible here, the only appropriately certified class for plaintiffs' contract claims is a state wide class. We reverse, in part, and remand for proceedings consistent with this opinion.

FACTS
¶ 2 Customers of AT & T Wireless Services, Inc. (AT & T) filed a nationwide class action alleging the company misled consumers when it billed them for a charge that was not included in advertised monthly rates and was not described clearly in billing statements. The Federal Communications Commission (FCC) requires telecommunications companies like AT & T to contribute to the Universal Service Fund (USF), a fund created by the Telecommunications Act of 1996 that subsidizes phone and Internet service to low-income and rural areas. The FCC expressly permits companies to recover USF contributions from customers. AT & T recovered its contributions from customers by charging a Universal Connectivity Charge (UCC), listed in customer agreements as either "Other Charges & Credits" or "Taxes, Surcharges & Regulatory Fees." Pet. for Review at 3. Named plaintiff Martin Schnall claims this categorization of the UCC violates the Washington Consumer Protection Act (CPA), chapter 19.86 RCW, and further, that *933 AT & T violated the terms of its contract by failing to disclose the charge at the time he signed his agreement for wireless service. Schnall further claims AT & T violated the terms of its user contracts by increasing the UCC charge without notice. Schnall sought certification of a nationwide class of all AT & T customers "who have been improperly billed and paid a universal connectivity charge that they did not owe." Clerk's Papers (CP) at 186 (First Amended Class Action Complaint).
¶ 3 The trial court determined that "individual questions predominated over common questions" and denied class certification on all of Schnall's claims. CP at 417-18 (Mem. Op. Denying Mot. for Class Certification at 1-2) (Mem. Op.). Schnall appealed that decision to Division One of the Court of Appeals which reversed the trial court and certified the class.

Standard of Review
¶ 4 The standard of review is paramount in this case: it is not our place to substitute our judgment for that of the trial court. When this court reviews a trial court's decision to deny class certification, that decision is afforded a substantial amount of deference. "[I]f the record indicates the court properly considered all CR 23 criteria," this court will not disturb its decision. Nelson v. Appleway Chevrolet, Inc., 160 Wash.2d 173, 188, 157 P.3d 847 (2007). "[A] trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds." Dix v. ICT Group, Inc., 160 Wash.2d 826, 833, 161 P.3d 1016 (2007).

Enforceability of Choice of Law Clauses
¶ 5 The parties initially dispute whether the choice of law clauses in the customers' contracts are enforceable. The choice of law clauses in this case require customers to litigate asserted violations of their contract in the respective jurisdiction where they signed the contract. This jurisdiction is often based on the customer's area code.
¶ 6 We interpret contract provisions to render them enforceable whenever possible. Patterson v. Bixby, 58 Wash.2d 454, 459, 364 P.2d 10 (1961). Further, "[w]e generally enforce contract choice of law provisions." McKee v. AT & T Corp., 164 Wash.2d 372, 384, 191 P.3d 845 (2008) (citing Erwin v. Cotter Health Ctrs., Inc., 161 Wash.2d 676, 694-96, 167 P.3d 1112 (2007)). In Erwin we applied section 187 of the Restatement (Second) of Conflict of Laws (1971) (Restatement) to hold the parties' contractual choice of law provision was effective. Section 187 reads in significant part:
"`(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
"`(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
"`(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.'"
Erwin, 161 Wash.2d at 694-95, 167 P.3d 1112 (quoting O'Brien v. Shearson Hayden Stone, Inc., 90 Wash.2d 680, 685, 586 P.2d 830 (1978), adhered to on recons., 93 Wash.2d 51, 605 P.2d 779 (1980)). To effectively void a choice of law provision, a court must find that the chosen state has no substantial relationship to the parties or that the application of the chosen law would be contrary to a fundamental policy of Washington. Id. at 698, 586 P.2d 830. Further, Washington courts have also adopted the "significant relationship" test in section 145 of the Restatement, which gives great weight to the place where the parties' relationship was entered. Johnson v. Spider Staging Corp., 87 Wash.2d 577, 580-82, 555 P.2d 997 (1976).
¶ 7 Other courts have also recognized the importance of the location of the contractual relationship in deciding choice of law problems *934 as they apply to class certification. In Kelley v. Microsoft Corp., 251 F.R.D. 544 (W.D.Wash.2008), the district court found the most significant contacts to exist in Washington because in addition to being the location where Microsoft "developed and launched its allegedly deceptive promotional program," "the parties' relationship is not centered in any particular place because the parties did not contract with one another." Id. at 552 (emphasis added) (citing Restatement § 145(2)(b), (d) and applying Washington state law to class action certification of CPA and contract claims). Though not a class action, in Kammerer v. W. Gear Corp., 96 Wash.2d 416, 423, 635 P.2d 708 (1981), we held that because the parties contracted in California to have California law apply, the choice of law clause should be enforced.
¶ 8 The choice of law provisions in this case were mostly based on customers' area codes, not on forums having no substantial relationship to the parties or location of the transaction between them. While it is true that AT & T is headquartered in Washington State, the customer's area code is left to the discretion of the customer, and this area code often corresponds with the customer's place of residence: in effect the customer selected which forum's law would apply when he requested phone service from AT & T. AT & T should not now be forced to face the enormous cost and complexity presented by a nationwide class action when they conscionably included choice of law provisions in their customers' contracts and the choice of forum is dictated by the consumer. See generally 4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 13:63, at 476 (4th ed. 2002) ("Like all litigation, complex cases are more likely to be settled than tried. The stakes in the case and the cost of pretrial activity increase that likelihood.").
¶ 9 Schnall presents no valid reason why we should now invalidate the choice of law clause each customer signed when he or she purchased wireless service from AT & T.[1] The trial court did not abuse its discretion when it held
[t]here does not seem to be any public policy reason not to enforce the choice of law provision of the agreements in this case. The law of the State associated with the area code will generally be the law of the customer's home state, thereby applying to that customer the law with which he or she is most familiar.
CP at 418 (Mem. Op. at 2). Upholding the trial court's decision to deny certification of a nation wide class does nothing to prevent persons outside of Washington from filing statewide class actions in each of their respective home states. Indeed, the citizens of California have already filed such a statewide class action. Suppl. Br. of Pet'r AT & T, Ex. A (Order Granting Approval of Form Class Notice, Randolph v. AT & T Wireless Servs., Inc., No. RG05193855).

Class Certification of Contract Claims
¶ 10 Schnall brings two types of claims before the court: one based in contract, the other based on the CPA. The differences between these two types of claims have important implications for analysis of their suitability as class action claims. AT & T argues the trial court was correct in deciding that the choice of law clauses in each customer's contract caused individual issues to predominate over common ones.
¶ 11 As noted above, the choice of law clause in each customer's contract is valid. The trial court held: "[a]pplying the law of the customer's home state to the contract claims in this case makes the contract claims unmanageable." CP at 418 (Mem. Op. at 2) (citing In re Sch. Asbestos Litig., 789 F.2d 996 (3d Cir.1986); Rory Ryan, Uncertifiable?: The Current Status of Nationwide State-Law Class Actions, 54 Baylor L.Rev. 467 (2002)).
¶ 12 To validly certify a nationwide class for the contract claims, Schnall must meet the requirements of CR 23(a): numerosity, commonality, typicality, and adequacy of representation. Once those have been met, he must further satisfy the tougher *935 standard of CR 23(b)(3) and prove that common legal and factual issues predominate over individual issues and that a class action is an otherwise superior form of adjudication. Factors to be considered by the court when assessing predominance and superiority include
(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.
CR 23(b)(3). It is "incumbent upon class counsel to prove to the court ... that there are no significant differences in the various state laws, or if there are variations, that they can be managed by the trial court." 4 Conte & Newberg, supra, § 13:36, at 436-37 (citing Arthur R. Miller & David Crump, Jurisdiction and Choice of Law in Multistate Class Actions after Phillips Petroleum Co. v. Shutts, 96 Yale L.J. 1, 63-68 (1986)).
¶ 13 The Court of Appeals held that a "common nucleus of operative facts" predominated, but failed to substantially analyze the issue of predominance, especially in consideration of the potential application of 50 different states' laws. Schnall v. AT & T Wireless Servs., Inc., 139 Wash.App. 280, 298-99, 161 P.3d 395 (2007). The Court of Appeals' predominance analysis reads more like a CR 23(a) commonality test: "The common nucleus of facts among all class members on this breach of contract claims is .... The common legal theory is." Schnall, 139 Wash. App. at 299, 161 P.3d 395 (emphasis added). Simply stating the existence of commonalities does not prove predominance.[2] The trial court's analysis on this point is more thorough and is clearly supportable under our abuse of discretion standard.
¶ 14 As the Court of Appeals noted, the trial court "made several findings about the individual issues the contract claim raised." Id. at 298, 161 P.3d 395. The trial court found that the choice of law clauses, the interpretation of the contract terms, the differences in the materials and information each potential class member received, and the availability of differing affirmative defenses created a predominance of individual issues over common ones. CP at 418-19 (Mem. Op. at 2-3).
¶ 15 Because CR 23 is identical to its federal counterpart, "cases interpreting the analogous federal provision are highly persuasive." Schwendeman v. USAA Cas. Ins. Co., 116 Wash.App. 9, 19 n. 24, 65 P.3d 1 (2003) (citing Pickett v. Holland Am. Line-Westours, Inc., 145 Wash.2d 178, 188, 35 P.3d 351 (2001)). The Court of Appeals reached a conclusion that flies in the face of this "highly persuasive" federal law regarding nationwide class action certification: "[b]ased primarily on the burden of applying multiple states' laws, an overwhelming number of federal courts have denied certification of nationwide state-law class actions." Ryan, supra, at 470 (emphasis added) (citing Stirman v. Exxon Corp., 280 F.3d 554, 564-66 (5th Cir.2002); Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1187, amended by 273 F.3d 1266 (9th Cir.2001); Szabo v. Bridgeport Machs., Inc., 249 F.3d 672, 678 (7th Cir.2001); In re LifeUSA Holding, Inc., 242 F.3d 136, 147 (3d Cir.2001); Spence v. Glock, Ges.m.b.H., 227 F.3d 308, 316 (5th Cir.2000); Andrews v. Am. Tel. & Tel. Co., 95 F.3d 1014, 1025 (11th Cir.1996); Castano v. Am. Tobacco Co., 84 F.3d 734, 740 (5th Cir.1996); Georgine v. Amchem Prods., Inc., 83 F.3d 610, 617 (3d Cir.1996), aff'd sub nom. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 613, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); In re Am. Med. Sys., Inc., 75 F.3d 1069, 1089 (6th *936 Cir.1996); In re Rhone-Poulenc Rorer Inc., 51 F.3d 1293, 1302 (7th Cir.1995); Walsh v. Ford Motor Co., 257 U.S.App. D.C. 85, 807 F.2d 1000, 1010-11 (1986); In re Citigroup, Inc., No. CIV.A. 10011912REK, 2001 WL 1682865, at *3 (D.Mass. Dec. 19, 2001); Hammett v. Am. Bankers Ins. Co., 203 F.R.D. 690, 700-02 (S.D.Fla.2001); Duncan v. Northwest Airlines, Inc., 203 F.R.D. 601, 605, 610-14 (W.D.Wash.2001); Neely v. Ethicon, Inc., No. 1:00-CV-00569, 2001 WL 1090204, at *8-11, *15 (E.D.Tex. Aug. 15, 2001); Begley v. Acad. Life Ins. Co., 200 F.R.D. 489, 497 (N.D.Ga.2001); Oxford v. Williams Cos., Inc., 137 F.Supp.2d 756, 764 (E.D.Tex.2001); Jones v. Allercare, Inc., 203 F.R.D. 290, 308 (N.D.Ohio 2001); Stipelcovich v. Directv, Inc., 129 F.Supp.2d 989, 995 (E.D.Tex.2001); Shelley v. AmSouth Bank, No. CIV.A.97-1170-RV-C, 2000 WL 1121778, at *8-10 (S.D.Ala. July 24, 2000), aff'd, 247 F.3d 250 (11th Cir.2001); Lyon v. Caterpillar, Inc., 194 F.R.D. 206, 220-23 (E.D.Pa. 2000); Adams v. Kan. City Life Ins. Co., 192 F.R.D. 274, 277-78 (W.D.Mo.2000); Hallaba v. Worldcom Network Servs. Inc., 196 F.R.D. 630, 645 (N.D.Okla.2000); Velasquez v. Crown Life Ins. Co., MDL 1096 No. CIV. A.M-97-064, 1999 WL 33305652, at *4-7 (S.D.Tex. Aug. 10, 1999); Clay v. Am. Tobacco Co., 188 F.R.D. 483, 497-98, 503 (S.D.Ill. 1999); Carpenter v. BMW of N. Am., Inc., No. CIV.A.99-CV-214, 1999 WL 415390, at *4, 8 (E.D.Pa. June 21, 1999); Chilton Water Auth. v. Shell Oil Co., No. CIV.A.98-T-1452-N, 1999 WL 1628000, at *8 (M.D.Ala. May 21, 1999); Powers v. Gov't Employees Ins. Co., 192 F.R.D. 313, 319-20 (S.D.Fla.1998); Rothwell v. Chubb Life Ins. Co. of Am., 191 F.R.D. 25, 33 n. 7 (D.N.H.1998); Dhamer v. Bristol-Myers Squibb Co., 183 F.R.D. 520, 532-34 (N.D.Ill.1998); Weikel v. Tower Semiconductor Ltd., 183 F.R.D. 377, 402-03 (D.N.J.1998); In re Jackson Nat'l Life Ins. Co. Premium Litig., 183 F.R.D. 217, 225 (W.D.Mich.1998); Chin v. Chrysler Corp., 182 F.R.D. 448, 465 (D.N.J.1998); Marascalco v. Int'l Computerized Orthokeratology Soc'y, Inc., 181 F.R.D. 331, 340-41 (N.D.Miss. 1998); In re Ford Motor Co. Vehicle Paint Litig., 182 F.R.D. 214, 222-26 (E.D.La.1998); Fisher v. Bristol-Myers Squibb Co., 181 F.R.D. 365, 368 (N.D.Ill.1998); Poe v. Sears, Roebuck & Co., 1 F.Supp.2d 1472, 1476 (N.D.Ga.1998); Borskey v. Medtronics, No. CIV.A.94-2302, 1998 WL 122602, at *3 (E.D.La. Mar. 18, 1998); Tylka v. Gerber Prods. Co., 178 F.R.D. 493, 496-99, 502 (N.D.Ill.1998); Peoples v. Am. Fid. Life Ins. Co., 176 F.R.D. 637, 646 (N.D.Fla.1998); In re Ford Motor Co. Bronco II Prod. Liab. Litig., 177 F.R.D. 360, 376 (E.D.La.1997); Clement v. Am. Honda Fin. Corp., 176 F.R.D. 15, 23 n. 10-12 (D.Conn.1997); Dubose v. First Sec. Sav. Bank, 183 F.R.D. 583, 587 (M.D.Ala.1997); In re Ford Motor Co. Ignition Switch Prods. Liab. Litig., 174 F.R.D. 332, 347-52 (D.N.J.1997); In re Stucco Litig., 175 F.R.D. 210, 219 (E.D.N.C.1997); Smith v. Brown & Williamson Tobacco Corp., 174 F.R.D. 90, 100 (W.D.Mo.1997); Rohlfing v. Manor Care, Inc., 172 F.R.D. 330, 341-42 (N.D.Ill.1997); In re Masonite Corp. Hardboard Siding Prods. Liab. Litig., 170 F.R.D. 417, 422-27 (E.D.La.1997); Mack v. Gen. Motors Acceptance Corp., 169 F.R.D. 671, 679 (M.D.Ala.1996); Harding v. Tambrands Inc., 165 F.R.D. 623, 631-33 (D.Kan. 1996); Barbarin v. Gen. Motors Corp., No. CIV.A.84-0888, 1993 WL 765821, at *3 (D.D.C. Sept. 22, 1993); Raye v. Medtronic Corp., 696 F.Supp. 1273, 1275 (D.Minn.1988); Feinstein v. Firestone Tire & Rubber Co., 535 F.Supp. 595, 608 (S.D.N.Y.1982)).
¶ 16 Even where courts find that a nationwide, state-law governed class otherwise meets Rule 23(a) and 23(b)(3) criteria, "the choice-of-law inquiry will ordinarily make or break certification." Ryan, supra, at 474. This is because if the laws of 50 jurisdictions apply to plaintiffs' claims, "the variations in the laws of the states ... `may swamp any common issues and defeat predominance.'" Spence, 227 F.3d at 311 (quoting Castano, 84 F.3d at 741); see also Georgine, 83 F.3d at 627 ("[B]ecause we must apply an individualized choice of law analysis to each plaintiff's claims, the proliferation of disparate factual and legal issues is compounded exponentially" (citation omitted)); In re Am. Med. Sys., Inc., 75 F.3d at 1085 ("If more than a few of the laws of the fifty states differ, the district judge would face an impossible task of instructing a jury on the relevant law, yet another reason why class *937 certification would not be the appropriate course of action.").
¶ 17 The choice of law provisions in this case will do more than cause variations in damages. The availability of the voluntary payment doctrine alone could abrogate AT & T's liability for all customers who voluntarily paid the UCC after receiving the informational flyer detailing their responsibility for its payment and reside in states employing the doctrine. This is only one example.
¶ 18 The Court of Appeals dismissed the trial court's concerns in part because it determined that "extrinsic evidence" "will not be necessary here because these consumers entered into a standardized contract." Schnall, 139 Wash.App. at 299-300, 161 P.3d 395. However, there is no support cited for this conclusion. Indeed, some Washington courts have held just the opposite: "When material extrinsic evidence shows that outside agreements were relied upon, those parol agreements should be given effect rather than allowing boilerplate `to vitiate the manifest understanding of the parties.'" Lopez v. Reynoso, 129 Wash.App. 165, 173, 118 P.3d 398 (2005) (quoting Lyall v. DeYoung, 42 Wash.App. 252, 258, 711 P.2d 356 (1985)). Further, simply because the Court of Appeals finds extrinsic evidence would be unnecessary under Washington law does not mean that the law of all other 49 states would exclude such evidence as well.
¶ 19 An additional concern is the availability of affirmative defenses. As the trial court noted, "[s]ome states, such as Illinois, ... allow as a contract claim defense, the voluntary payment doctrine which prohibits a contract claim for refund of a sum voluntarily paid." CP at 419-20 (Mem. Op. at 3-4) (citing Smith v. Prime Cable of Chi., 276 Ill.App.3d 843, 658 N.E.2d 1325, 213 Ill.Dec. 304 (1995)). The Court of Appeals suggested the trial court employ subclasses and master's hearings to sort out the morass. However, the availability of these mechanisms for efficient management of large class actions cannot change the predominance of the individualized issues in this case. See 2 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 4:32, at 286-87 (4th ed.2002) (noting courts have found "subclasses would not cure the problems" of diverse factual issues and that "when a court determines that a multitude of mini-trials will be necessary to dispose of individual claims, the court will likely find that common questions do not predominate."). As the trial court noted, "[w]hile Washington would be only one of fifty jurisdictions' law[s] which would have to be addressed in resolving the contract claims, it is illustrative of the issues that would arise." CP at 418 (Mem. Op. at 2).

Superiority Analysis
¶ 20 Even if individualized issues did not predominate, CR 23(b)(3) also requires "that a class action [be] superior to other available methods for the fair and efficient adjudication of the controversy." (Emphasis added.) See also 4 Conte & Newberg, supra, § 13:11, at 406 ("It must be emphasized that, under the rule, a class action must be superior, not just as good as, other available methods." (emphasis added)). The superiority requirement "focuses upon a comparison of available alternatives." Sitton v. State Farm Mut. Auto. Ins. Co., 116 Wash. App. 245, 256, 63 P.3d 198 (2003) (citing 1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 4.27 (3d ed.1992)).
¶ 21 In more traditional statewide class actions, these alternatives include joinder, intervention, or consolidation. Id. The most obvious alternative to the proposed nationwide class action in this case is numerous statewide class actions brought by the citizens of each state against AT & T. This is not a case where the choice is either a nationwide class action or no action at all. Miller & Crump, supra, at 71 ("Our analysis suggests that some of the problems of jurisdiction and choice of law could be solved by resort to statewide, as opposed to nationwide, class actions."). Given the sheer number of AT & T customers in each of the 50 states, no one state's citizens will be left out in the class action cold without the possibility of amassing enough individual claims within their state to cover litigation costs. Cf. Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 809, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) ("Class actions also may permit the plaintiffs to pool claims which would be uneconomical *938 to litigate individually.... [M]ost of the plaintiffs would have no realistic day in court if a class action were not available.").
¶ 22 Although it is true that small amounts of money are at issue and the decision will have broad impact, Schnall, 139 Wash.App. at 299, 161 P.3d 395, there is simply no efficiency in asking a trial judge to manage the laws of 50 different states as they apply to plaintiffs' contract claims and the varied factual scenarios inherent therein. See Miller & Crump, supra, at 64 ("Beyond the difficult task of correctly determining foreign law, the nationwide class action may present an even greater problem because of the sheer burden of organizing and following fifty or more different bodies of complex substantive principles. Although the comparison obviously is inexact, one can appreciate the magnitude of the trial judge's task by imagining a first-year law student who, instead of a course in contracts, is required simultaneously to enroll in fifty courses, each covering the contract law of a single state, and to apply each body of law correctly on the final examination." (footnote omitted)).
¶ 23 Further, Washington has no interest in seeing contracts executed by AT & T representatives in other states with citizens of those states examined and adjudicated in Washington courts. Certified as a nationwide class action, this case would present an unwarranted and unnecessary burden on the state judicial system, all at a large cost to taxpayers. See R.J. Reynolds Tobacco Co. v. Engle, 672 So.2d 39, 41 (Fla.Dist.Ct.App. 1996) ("No doubt a tremendous number of retired judges, special masters, and general masters would have to be appointed by the court in order to complete this herculean task within a reasonable period of timeall at a staggering cost to the taxpayers."). There is no sound reason in this case for this court to force Washington trial courts to entertain the contract claims of citizens from around the nation. Their state courts are equally as prepared, if not better situated to apply the contract laws of their states. The trial court did not abuse its discretion by denying nationwide certification of the plaintiffs' contract claims. This court does not dispute, however that if the contract class were constructed as a statewide class, it would meet the requirements of both CR 23(a) and (b)(3).

Extraterritorial Application of Washington's Consumer Protection Act
¶ 24 The trial court and the Court of Appeals both noted that the CPA was applicable to all plaintiffs' claims because they arose from statute instead of contract. However, nothing in our law indicates that CPA claims by nonresidents for acts occurring outside of Washington can be entertained under the statute. "Because the laws of each state are designed to regulate and protect the interest of that state's own residents and citizens, each state has a measurable, and usually predominant, interest in having its own substantive laws apply." 4 Conte & Newberg, supra, § 13:37, at 438. While it is true that "Washington has a strong interest in regulating any behavior by Washington businesses which contravenes the CPA," CP at 421 (Mem. Op. at 5), the CPA indicates the legislature's intent to limit its application to deceptive acts that affect the citizens and residents of Washington. The CPA states: "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." RCW 19.86.020. "Trade" or "commerce" is defined as "the sale of assets or services, and any commerce directly or indirectly affecting the people of the state of Washington." RCW 19.86.010(2) (emphasis added). To state a CPA claim a person must show that the unfair or deceptive act affected the people of the state of Washington. This geographic and jurisdictional limitation originates in the CPA's history as a tool used by the State attorney general to protect the citizens of Washington. Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc., 162 Wash.2d 59, 74, 170 P.3d 10 (2007). The attorney general of the state of Washington has no power outside the geographic boundary of this state. It is understood that her actions will be brought on "behalf of persons residing in the state." RCW 19.86.080(1).
¶ 25 This statutory and jurisdictional limitation cannot be obviated simply *939 because the claimants are private citizens. Indeed, our courts retained this limitation for private attorneys general through the requirement that the private claimants prove a defendant's practices affect "the public interest." Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wash.2d 778, 784, 719 P.2d 531 (1986). Because of the statute's jurisdictional limitation, applicable to both the attorney general and private claimants, a private claimant cannot state a CPA claim by proving the defendant's practices affected the public interest or the citizens of another state. See Lyon, 194 F.R.D. at 215 ("State consumer fraud acts are designed to either protect state residents or protect consumers engaged in transactions within the state."). RCW 19.86.920 does not indicate otherwise. This portion of the CPA empowers courts analyzing unfair competition claims to consider "whether conduct restrains or monopolizes trade or commerce" even when those market effects are felt outside of Washington. RCW 19.86.920. This provision merely closes a potential loophole in the CPA that would allow companies to escape liability by claiming their methods of competition are within Washington's boundaries even though those methods effectively monopolize trade outside the state. This portion of the statute does not give Washington the power to enforce its laws outside its territorial borders.
¶ 26 Even the general extraterritorial flavor of RCW 19.86.920 cannot change the clear standing limitations in the statute: a claimant must allege injury in trade or commerce that "directly or indirectly affect[s] the people of the state of Washington." RCW 19.86.010(2); Panag v. Farmers Ins. Co. of Wash., 166 Wash.2d 27, 38, 204 P.3d 885 (2009) ("[T]he Hangman Ridge-test incorporates the issue of standing, particularly the elements of public interest impact and injury."). In the context of this case, the CPA only applies to claims brought by persons residing in Washington.

Remaining Washington Plaintiffs' CPA Claims
¶ 27 The question then remains, can a class of Washington only CPA plaintiffs be certified? The trial court correctly found that "proof of causation is an essential element of a CPA action." CP at 421 (Mem. Op. at 5). Hangman Ridge, 105 Wash.2d at 785, 719 P.2d 531, requires CPA plaintiffs to establish a causal link "between the unfair or deceptive act complained of and the injury suffered." We have more recently held that this causal link must establish that the "injury complained of ... would not have happened" if not for defendant's violative acts. Indoor Billboard, 162 Wash.2d at 82, 170 P.3d 10. The quantum of proof necessary to establish the proximate, "but for" causation required by the CPA is not fully developed in our case law. However, Indoor Billboard clearly establishes that proximate cause in a class action cannot be established by "mere payment" of an allegedly injurious charge, though that payment can be "considered with all other relevant evidence on the issue of proximate cause." Id. at 83. Indoor Billboard did not reject individual reliance as a method of proving causation under the CPA, but merely held that plaintiffs cannot be required to show reliance where other evidence is sufficient to establish "but for" causation. Id. at 85, 170 P.3d 10 (noting that injury may be established as a result of "reliance on information" and citing Nuttall v. Dowell, 31 Wash.App. 98, 639 P.2d 832 (1982) for support). Nuttall held "a party has not established a causal relationship with a misrepresentation of fact where he does not convince the trier of fact that he relied upon it." Nuttall, 31 Wash.App. at 111, 639 P.2d 832. We recently affirmed that reliance is not a dead letter in our law: "[d]epending on the deceptive practice at issue and the relationship between the parties, the plaintiff may need to prove reliance to establish causation, as in Indoor Billboard." Panag, 166 Wash.2d at 59 n. 15, 204 P.3d 885.
¶ 28 Our decision to retain reliance as one method of proving "but for" causation inherently recognizes a principle established in multiple forums, that the difference between "but for proximate cause" and individual reliance varies with the context of the claim:
[W]here, as here, the plaintiffs allege that their damages were caused by deceptive, *940 misleading, or fraudulent statements or conduct ..., as a practical matter it is not possible that the damages could be caused by a violation [of the Minnesota CPA] without reliance on the statements or conduct alleged to violate the statutes.
Group Health Plan, Inc. v. Philip Morris, Inc., 621 N.W.2d 2, 13 (Minn.2001); accord, e.g., Hageman v. Twin City Chrysler-Plymouth Inc., 681 F.Supp. 303, 308 (M.D.N.C. 1988) ("To prove actual causation, a plaintiff must prove that he or she detrimentally relied on the defendant's deceptive statement or misrepresentation.") (citing Pearce v. Am. Defender Life Ins. Co., 316 N.C. 461, 343 S.E.2d 174, 180 (1986)); Feitler v. Animation Celection, Inc., 170 Or.App. 702, 13 P.3d 1044, 1047 (2000) (holding causal element of misrepresentation claim requires reliance by the consumer); cf. Siemer v. Assocs. First Capital Corp., No. CV 97-281 TUC JMR (JCC), 2001 WL 35948712, at *4 (D.Ariz. Mar. 30, 2001) ("The injury element of the [state consumer protection statute] claim occurs when the consumer relies on the misrepresentations."); see generally Sheila B. Scheuerman, The Consumer Fraud Class Action: Reining in Abuse by Requiring Plaintiffs to Allege Reliance as an Essential Element, 43 Harv. J. on Leg. 1 (2006).
¶ 29 As noted in Nuttall, in the context of private CPA actions where plaintiffs seek damages, more than a mere capacity to deceive must be shown to establish "some causal link between defendant's unfair act and [consumer's] injury." 31 Wash.App. at 110, 639 P.2d 832.
¶ 30 In the context of private misrepresentation cases, a plaintiff can satisfy the "but for" causation requirement by showing she relied on the misrepresentation. See State ex rel. D.R.M., 109 Wash.App. 182, 197 n. 8, 34 P.3d 887 (2001) ("The but-for test of causation employed in that case would fail here since McDonald did not rely on Wood's promise."); Bank of China, N.Y. Branch v. NBM, LLC, 359 F.3d 171, 178 (2d Cir.2004) (requiring plaintiffs to demonstrate "reasonable reliance" to satisfy the proximate cause requirement in a civil RICO proceeding); Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co., 319 F.3d 205, 218-19 (5th Cir.2003) (holding that where "[k]nowledge of the truth defeats a claim of fraud because it eliminates the deceit as the `but for' cause of the damages," proof of reliance is required); Huddleston v. Herman & MacLean, 640 F.2d 534, 549 (5th Cir.1981) (reliance is "a type of `but for' requirement: had the [purchaser] known the truth he would not have acted"), aff'd in part, rev'd in part, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).
¶ 31 As the trial court recognized, this court does not require proof of individual reliance from CPA claimants as a separate element. But, where knowledge of the truth would defeat a claim of misrepresentation, that alleged misrepresentation has been eliminated as the "but for" cause of the claimant's injury. In misrepresentation and deception or fraud cases, the claimant may be called upon to offer more individualized proof that she had no knowledge of the truth because the remaining evidence is simply insufficient to establish "but for" causation. Kelley, 251 F.R.D. at 557-58 (analyzing class certification under Washington's CPA after Indoor Billboard to hold "a deception-based theory of causation would necessarily require the trier of fact here to determine whether individual class members were actually deceived and whether they would have purchased [the goods] but for Microsoft's marketing of them." The court went on to allow class certification on plaintiff's "price inflation" or "market theory" of causation.) (citing Oshana v. Coca-Cola Bottling Co., 225 F.R.D. 575 (N.D.Ill.2005), aff'd, 472 F.3d 506 (7th Cir. 2006); Wright v. Fred Hutchinson Cancer Research Ctr., No. C01-5217L, 2001 WL 1782714 (W.D.Wash. Nov. 19, 2001); Hutson v. Rexall Sundown, Inc., 837 So.2d 1090 (Fla. Dist.Ct.App.2003)). In the case at hand, for example, some plaintiffs received materials that "specifically list the `universal connectivity charge' as one of the fees, taxes, and surcharges which the customer is responsible for paying." CP at 418 (Mem. Op. at 2). Under plaintiffs' misrepresentation theory of causation the trial court will need to decide, as in Kelley, whether "individual class members were actually deceived and whether they would have" purchased their cellular service, or paid the UCC but for AT & T's *941 marketing of the cost of the cellular plan or their explanations regarding the genesis of the UCC. Kelley, 251 F.R.D. at 558.
¶ 32 The trial judge found that "[i]n the context of" a nationwide CPA action, proof of causality for each plaintiff "must necessarily be individual for each potential class member," resulting in an uncertifiable class in which "individual issues would predominate over class issues and a class action would be unmanageable." CP at 422 (Mem. Op. at 6) ("In the context of this case, each plaintiff must show that [AT & T's] alleged misrepresentation about the plaintiff's obligation to pay a UCC affected the plaintiff's decision to chose [AT & T] as a wireless provider."). However, the trial court provided no specific analysis of whether proof of causality would be so individualized among a class comprised only of Washington customers. For example, if Washington customers all had received no information regarding the UCC, proof of causality could be more common than if they all had received different and allegedly fraudulent representations: proving a plaintiff relied on an affirmative misrepresentation is necessarily individualized, but proving the lack of information was the common cause of each plaintiffs' decision to sign up for wireless service could be more generalized.
¶ 33 Because the trial court did not analyze the causality element of plaintiffs' CPA claims as it would apply only to the facts and evidence pertaining to Washington customers, we remand for further consideration of this issue in accordance with our opinion.
¶ 34 In sum, we agree with the trial court that this action should not be certified as a nation wide class action. Washington need not apply its Consumer Protection Act, or its contract laws, to the citizens of other states in order to protect the interests of the citizens of Washington. A nationwide class would be unmanageable and unduly burdensome on the trial court and the state judicial system and serve no real benefit to plaintiffs who are free to bring statewide class actions in their home states.
WE CONCUR: CHARLES W. JOHNSON, MARY E. FAIRHURST, GERRY L. ALEXANDER and JAMES M. JOHNSON, JJ.
SANDERS, J. (dissenting).
¶ 35 Because the trial court abused its discretion when it denied nationwide class certification absent a sufficient analysis of the feasibility of such a class, I dissent.
¶ 36 This court reviews a trial court's class certification ruling for abuse of discretion. Smith v. Behr Process Corp., 113 Wash.App. 306, 318, 54 P.3d 665 (2002). A discretionary decision will not be disturbed unless it is based on untenable grounds or is manifestly unreasonable or arbitrary. Oda v. State, 111 Wash.App. 79, 91, 44 P.3d 8 (2002). To certify a class, a trial court must find numerosity, commonality, typicality, and adequacy of representation. CR 23(a); Smith, 113 Wash.App. at 319, 54 P.3d 665. The court must also find (1) that there is a risk of inconsistent results on individual claims resulting in inconsistent standards of conduct or the possibility of a preclusive effect on other class members, or (2) that injunctive or declaratory relief is appropriate for the class as a whole, or (3) that common questions of law or fact predominate. CR 23(b); Smith, 113 Wash.App. at 321-22, 54 P.3d 665.
¶ 37 The trial court denied class certification because it reasoned the contract claims would be unmanageable (lacking commonality, typicality, and predominance of common questions) because 50 different state laws would need to be applied in order to interpret contract provisions and apply affirmative defenses, Clerk's Papers (CP) at 617-19 (Mem. Op. at 2-4); and Washington's Consumer Protection Act (CPA) applied nationwide but each individual would need to prove causationthat the alleged misrepresentation affected his or her decision to choose AT & T[1] as a wireless providerand therefore individual issues predominated over class issues, CP at 619-21 (Mem. Op. at 4-6).
¶ 38 The Court of Appeals reversed, reasoning the contract claims all shared a common legal theory, and any differences could be resolved through subclasses and master's *942 hearings, and the CPA claims could be litigated nationwide and causation could be proven by means other than individual reliance. Schnall v. AT & T Wireless Servs., Inc., 139 Wash.App. 280, 289, 290-92, 161 P.3d 395 (2007), review granted, 163 Wash.2d 1022, 185 P.3d 1194 (2008).
¶ 39 The majority reverses the decision of the Court of Appeals, largely following the trial court's decision, reasoning the contract claims require application of individual state laws, and thus do not satisfy the predominance requirement for class certification, majority at 934-38; and the CPA claims cannot be certified for a class action because the general class issues do not predominate over individual ones where the trial court must make individual determinations of reliance, id. at 18-22. Unlike the trial court, the majority rejects the application of the Washington CPA nationwide, id. at 16-18, and leaves open whether a Washington-only class for the CPA claims might permit generalized proof of causation to provide for class certification, id. at 22-23.
¶ 40 I dissent. As recognized by the Court of Appeals, subclasses and master's hearings could be used to address differing state contract laws. Not every state contract law is materially different for purposes here, and the trial court abused its discretion by failing to consider whether the laws of the states could be grouped together in a manageable number of subclasses. I agree with the trial court and Court of Appeals that the Washington CPA can be applied nationwide; the majority all but ignores that AT & T Wireless Services, Inc. (AT & T), a party to every transaction at issue, is headquartered in Redmond, Washington, and the decisions, representations, and communications were made, formulated, and/or approved there. I disagree with the majority's view of causation under the CPA. The CPA and CR 23 (governing class certification), are intended to be liberally construed and should provide the class with a forum to litigate these claims. The majority creates impossible evidentiary burdens for the class that preclude it and future classes from challenging conduct as alleged herea corporation nickel and diming consumers wholesale, escaping litigation by only taking small amounts of money from each customer. For the sake of clarity I follow the headings used in the majority.[2]

Enforceability of choice of law provisions
¶ 41 The majority concludes that the choice of law clauses in the individual customers' contracts should be enforced. The majority's analysis appears to address only the contract claims and not the CPA ones. See majority at 933-34. I concur with the application of the choice of law clauses to the contract claims. As explained more fully below, however, this application of different state contract laws does not necessarily defeat class certification because subclasses and other mechanisms could likely be used to address any variances.
¶ 42 The choice of law clauses do not apply to the CPA claims.[3] The CPA claims are based upon statute, not contract, and many of the claims arose before the class members even entered into their contracts with AT & T pertaining to choice of law. The first element of a CPA actionan unfair or deceptive *943 actcan arise prior to a contract; a litigant need only show an act "had the capacity to deceive a substantial portion of the public." Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wash.2d 778, 785, 719 P.2d 531 (1986) (emphasis omitted).[4] That is the case here where the CPA claims relate to the use of allegedly deceptive language, advertising, and promotional materials.

Class certification of contract claims
¶ 43 The majority endorses the trial court's view that individual issues predominate over the common legal and factual issues due to the "interpretation of the contract terms" and "the availability of differing affirmative defenses" under the laws of 50 different states. Majority at 934-35. The trial court listed potential differences in contract interpretation, the voluntary payment doctrine, and the interpretation of arbitration agreements as examples of where the claims would need to be analyzed under 50 different state laws. However, not every law of the 50 states has a different approach to contract interpretation and affirmative defenses. Where state laws materially differ, subclasses could be established to address those differences. See Sitton v. State Farm Mut. Auto. Ins. Co., 116 Wash.App. 245, 255, 63 P.3d 198 (2003) ("courts have a variety of procedural options to reduce the burden of resolving individual damage issues, including bifurcated trials, use of subclasses or masters, pilot or test cases with selected class members"); In re Prudential Ins. Co. of Am. Sales Practices Litig., 962 F.Supp. 450, 468 (D.N.J.1997), aff'd, 148 F.3d 283 (3d Cir. 1998).[5]
¶ 44 The trial court abused its discretion by failing to determine whether the laws of the states could be separated into a few, manageable subclasses. The trial court only referenced speculative differences in the law of every state without determining whether material differences actually existed in each. I would therefore remand this issue to provide the parties an opportunity to further brief, and the trial court to fully consider, whether subclasses could be created to address materially different state laws within a nationwide class.

Superiority analysis
¶ 45 CR 23(b)(3) requires a court to find that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." The majority concludes that a nationwide class action is not superior to other available methods namely, that individual state class actions are better suited to resolve the controversy. Majority at 937. However, the majority's reasoning does not support this conclusion.
¶ 46 First, the majority asserts that, although class actions permit claims involving small amounts of money to be brought to court, this does not weigh in favor of a nationwide class because there are enough AT & T customers to bring 50 individual statewide class action suits.[6]See id. This *944 ignores the significant advantages of a nationwide suit. The claims in every state involve the nature of the universal connectivity charge (UCC), an apparent nationwide approach to charging fees in relation to the UCC, omissions or the same or similar misrepresentations to further that approach, and the same defendant corporation. A nationwide suit avoids a 50-fold redundancy of litigation, which will substantially increase the costs of the litigation to both parties, particularly attorney fees; result in redundant discovery, including repetitive document production and depositions; result in redundant relitigation of the same issues; and saddle the judiciary of all 50 states with significant costs to redundantly try statewide class action suits based on the actions of a single Washington corporation.
¶ 47 Next, the majority claims it would be inefficient to have a trial judge manage a claim litigated under 50 different state laws. Id. at 14-15.[7] As more fully discussed infra, the law of all 50 states will not conflict and, as recognized by the Court of Appeals, see Schnall, 139 Wash.App. at 299, 161 P.3d 395, subclasses and master's hearings can be used to address subsets of class members. The trial court abused its discretion, asserting a nationwide class would be unmanageable without analyzing the extent to which the state laws are materially similar and can be grouped into multistate subclasses.
¶ 48 Finally, the majority asserts Washington has no interest in having claims against a Washington corporation litigated in this state if they involve customers from other states. See majority at 938. But as later discussed in more detail, Washington has a substantial interest in assuring Washington corporations conduct business in a fair and honest manner. Washington also has a substantial interest to provide a forum to resolve the legal issues of Washington businesses.
¶ 49 Pending a determination that the contract laws of the 50 states do not materially differ from one another so as to preclude a manageable number of subclasses to address those differences, a nationwide class is the most efficient, economical, and reliable way to assure that every class member is provided a forum in which to bring his or her claim.

"Extraterritorial" application of Washington's Consumer Protection Act
¶ 50 The trial court and the Court of Appeals agreed that the Washington CPA was applicable to the nationwide class because AT & T is headquartered in Redmond, Washington. Washington regulates the behavior of Washington businesses; the purpose of the CPA is not only to protect the public from unfair and deceptive acts, but also to "foster fair and honest competition" among businesses. See RCW 19.86.920. If a Washington business is acting in an unfair or dishonest way nationwide, Washington has a strong interest to address the full, nationwide effects of that behavior; Washington should not become a harbor for businesses engaging in unscrupulous practices out of state. See Hangman Ridge, 105 Wash.2d at 785, 719 P.2d 531 ("`The CPA, on its face, shows a carefully drafted attempt to bring within its reaches every person who conducts unfair or deceptive acts or practices in any trade or commerce.'") (quoting Short v. Demopolis, 103 Wash.2d 52, 61, 691 P.2d 163 (1984))
¶ 51 The majority instead ignores this interest, mischaracterizing transactions between a Washington corporation and an out-of-state citizen as wholly extraterritorial, and then misreading the statutory language of the CPA to exclude "claims by nonresidents for acts occurring outside of Washington." See majority at 938. First, these transactions are not wholly extraterritorial. At least one partyAT & Tis native to Washington in every transaction here. The transactions involve AT & T's formulation of its representations,[8] the approval and distribution of *945 those representations, and the offer and acceptance of the agreements.[9] Significant portions of each transaction occurred in Washington.[10]
¶ 52 Second, the statutory language of the CPA applies to transactions between a Washington party and an out-of-state party in two ways here. RCW 19.86.020 requires that the "[u]nfair methods of competition and unfair or deceptive acts or practices" must be "in the conduct of any trade or commerce." (Emphasis added.) "Commerce" under the CPA is described as "any commerce directly or indirectly affecting the people of the state of Washington." RCW 19.86.010(2) (emphasis added). "Person" is defined to include "natural persons, corporations, trusts, unincorporated associations and partnerships." RCW 19.86.010(1) (emphasis added). Thus, the transaction here is "commerce" that "directly... affect[s]" AT & T, a corporation headquartered in Washington and thus a "person" under the CPA. The CPA therefore applies.
¶ 53 Furthermore, RCW 19.86.010(2) also encompasses commerce that indirectly affects the people of the state of Washington. Ignoring, as the majority does, that the statutory definition of "person" includes corporations, see RCW 19.86.010(1), AT & T's exchange of goods and services with individuals outside the state of Washington is still commerce that indirectly affects Washingtonians. First, the Washington employees of AT & T are "natural persons," see RCW 19.86.010(1), and AT & T's commerce with the claimants indirectly affects the nature and availability of their employment. Second, to the extent "the people of the state of Washington," see RCW 19.86.010(2), is read as a broader appeal to the public interest, the commerce and trade AT & T brings into Washington, and the alleged unfair and dishonest method by which it does so, affects the state economy and thus affects the Washington public at large.
¶ 54 The transactions here, between a Washington resident and out-of-state customers, originating at least in part in this state, fall well within the jurisdictional boundaries of the CPA.[11] The CPA encompasses the nationwide class action proposed here.

Remaining Washington plaintiffs' CPA claims (causation)
¶ 55 To prevail on a private CPA claim, a plaintiff must show the defendant (1) engaged in an unfair or deceptive act or practice, (2) in trade or commerce, (3) that affects the public interest, (4) and injured the plaintiff's business or property, and (5) there is a causal link between the unfair or deceptive act and the injury suffered. Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc., 162 Wash.2d 59, 74, 170 P.3d 10 (2007) (citing Hangman Ridge, 105 Wash.2d at 784-85, 719 P.2d 531). The fifth requirement, causation, is at issue here.
¶ 56 Causation "is a factual question to be decided by the trier of fact." Id. at 83, 170 P.3d 10. A plaintiff is not limited in how he or she can prove causation, as long as there is "some demonstration of a causal link between the misrepresentation and the plaintiff's injury." Id. In Indoor Billboard this court rejected the notion that payment of an invoice that contained a misrepresentation or omission was automatically sufficient evidence to establish causation; however, we recognized that such a payment, when considered with all relevant evidence, could be sufficient. Id. at 83-84, 170 P.3d 10.
¶ 57 That is the case here, where payment in combination with the whole of the evidence is sufficient to establish causation. The class members agreed to pay AT & T a certain amount for services; AT & T charged more *946 than that amount; AT & T misrepresented that the excess charges were imposed by the federal government on the consumer; those charges were not imposed by the federal government on the consumer; and the class members paid the excess charges.[12] A trier of fact could make the common sense inference that people do not willingly pay more money for commercial services than they must and, in particular, more than they originally agreed. People do, however, expect to be taxed; AT & T's misrepresentation of the fee as a mandatory federal tax on consumers causes class members to pay the "tax." Payment of the UCC in light of the nature of the misrepresentation and reasonable inferences drawn from common sense provides a sufficient basis for a trier of fact to find causation, as envisioned in Indoor Billboard. See id. at 84, 170 P.3d 10. Therefore the causation requirement does not preclude class certification here.
¶ 58 Despite our decision in Indoor Billboard the majority elevates the bar to prove causation far beyond any evidentiary standard that could be met by a class action seeking redress for a misrepresentation under the CPA. The majority requires each class member to show that he or she individually relied upon the misrepresentation including that he or she did not have knowledge of the true nature of the UCC. Majority at 940-41. The majority reasons this is necessary because knowledge of the truth of the charge would defeat causation since a misrepresentation could not cause an individual to pay a bogus fee where the individual already knew the fee to be bogus. See id.[13]
¶ 59 The majority's holding is nothing short of a disaster for plaintiffs, the CPA and CR 23, and the jurisprudence of this court. The majority's requirement of a showing of individualized reliance for misrepresentation claims under the CPA creates an individual issue that will predominate over the class issues here, see majority at 941, and in every CPA misrepresentation class action in the future. Under the majority's reasoning there is no longer any legal recourse for individuals who fall victim to the misrepresentations of corporations when those misrepresentations do not cause sufficient loss to make an individual lawsuit economically feasible. Yet assuring such access to the courts, even when the economic stakes are too small individually, is precisely the purpose of CR 23, see Scott v. Cingular Wireless, 160 Wash.2d 843, 856-57, 161 P.3d 1000 (2007) which the majority so effectively eviscerates.
¶ 60 The majority's holding also flies in the face of this court's history of liberally construing CR 23 and the CPA to effectuate their purposes. See Cingular Wireless, 160 Wash.2d at 856-57, 161 P.3d 1000 ("`"[T]he interests of justice require that in a doubtful case ... any error, if there is to be one, should be committed in favor of allowing the class action."'") (quoting Behr, 113 Wash. App. at 318-19, 54 P.3d 665 (second alteration in original) (quoting Esplin v. Hirschi, 402 F.2d 94, 101 (10th Cir.1968))); Dix v. ICT Group, Inc., 160 Wash.2d 826, 161 P.3d 1016 (2007); see also RCW 19.86.920. The CPA, which permits private citizens to act as private attorneys general to protect the public interest against unfair and deceptive practices, see Cingular Wireless, 160 Wash.2d at 851-53, 161 P.3d 1000, no longer provides any ability to protect the public now if a corporation misrepresents its charges or services to the public. The majority's requirement *947 of proof that each class member did not know the truth of the lie will destroy any class action.
¶ 61 The majority cites Kelley v. Microsoft Corp., 251 F.R.D. 544, 557-58 (W.D.Wash. 2008) for the proposition that deception-based claims require individualized proof of reliance (which then defeats class certification). See majority at 940. Causation is a fact-intensive inquiry, and the Kelley decision was decided under its facts. Under some facts, individualized proof may be required; under others, a trier of fact may find a sufficient causal link based upon a consideration of the circumstances as a whole. See Indoor Billboard, 162 Wash.2d at 84, 170 P.3d 10.
¶ 62 In Kelley, stickers on computer boxes stated the computers were using a Vista operating system, but did not inform customers that the Vista version they were using could not be upgraded to a premium version. 251 F.R.D. at 557. The court held a trier of fact considering causation would need to determine whether a consumer saw the sticker, knew the difference between the versions of Vista, and wanted the premium version. Id. at 558. The surrounding facts did not provide a basis to assume that all of the consumers wanted the ability to upgrade to the premium version.
¶ 63 Here, the surrounding facts provide a basis for a causal connection. Class members, after entering into a contract with AT & T at a certain price, would not have rationally intended to pay more without a valid justification for the additional charge. A trier of fact could draw the inference that individuals were motivated by the most obvious sourcea belief that the charge was a mandatory federal tax on consumers. Cf. Hangman Ridge, 105 Wash.2d at 795, 719 P.2d 531 (where this court made a similar distinction between fact sets, comparing those in Hangman Ridgewhere causation was not established due to causal gapsto those in our decision in Bowers v. Transamerica Title Ins. Co., 100 Wash.2d 581, 590, 675 P.2d 193 (1983)where the causal link was sufficiently established with reasonable inferences concerning the plaintiff's behavior).
¶ 64 The majority's view of causation is excessive and contrary to this court's previous holdings. Rather than render the CPA and CR 23 ineffectual in addressing the wholesale bilking of consumers, I would certify the class.

California class
¶ 65 Since the filing of the nationwide class action in Washington, a separate, state class action has been filed in California. The nationwide class has moved to amend so as to exclude the California class from the Washington litigation. The trial court should determine on remand whether the plaintiffs can exclude the California consumers, resolve reportedly inconsistent arguments concerning which state consumer protection law should apply, and avoid conflicts of interest among counsel.

Conclusion
¶ 66 The majority errs by holding the trial court did not abuse its discretion to decline certification of a nationwide class without first considering whether subclasses or master's hearings could be used to address potential material conflicts among state contract laws. The majority also errs when it neuters the Washington Consumer Protection Act, rendering its protection lean and lank, by providing a safe haven for businesses in Washington to engage in unfair or dishonest practices outside the state of Washington. I would remand the nationwide class certification issue to the trial court for reconsideration in light of the discussion here.
¶ 67 I dissent.
NOTES
[1] Among other things, Schnall also fails to explain why application of the "chosen states" law under the choice of law provisions would be contrary to a fundamental policy of this State under § 188(2)(b).
[2] Further, the Court of Appeals relied, in part, on Pickett v. Holland Am. Line-Westours, Inc., 145 Wash.2d 178, 35 P.3d 351 (2001), and the similarity between the legal theory in this case and the theory in Pickett to support its conclusion that common issues predominate. Schnall, 139 Wash.App. at 299, 161 P.3d 395. However, we have held Pickett holds little "precedential value." Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc., 162 Wash.2d 59, 76, 170 P.3d 10 (2007). Because the plaintiffs in this case must prove more than mere payment of a fee, the proof they must offer is necessarily more individualized than that required in Pickett.
[1] AT & T Wireless Services, Inc.
[2] Although one of the grounds upon which we granted review was federal preemption, the majority does not address that issuebut since the majority concludes that a Washington-only CPA class may survive, it tacitly rejects the preemption argument. There is no federal preemption here. The CPA does not preclude AT & T from billing its customers for contributions to the Universal Service Fund (which would be preempted), but rather precludes AT & T from doing so through misrepresentation or a failure to disclose the true nature of the charge (a matter of generally applicable state consumer protection). See IN RE TRUTH-IN-BILLING & BILLING FORMAT, 20 F.C.C.R. 6448, 6450 (2005), ("[N]o action we propose will limit states' ability to enforce their own generally applicable consumer protection laws."), vacated on other grounds sub nom. Nat'l Ass'n of State Util. Consumer Advocates v. Fed. Commc'ns Comm'n, 457 F.3d 1238, modified, 468 F.3d 1272 (11th Cir.2006).
[3] I can only assume that the majority, silent on this issue, see majority at 933-34, does not find the choice of law clauses applicable to the CPA claims. If it did, its further analysis of the "extraterritorial" application of and causation issues under the CPA would be rendered dictum since the multistate-law issue the majority finds so damning to class certification with regard to the contract claims would also apply to the CPA claims.
[4] A litigant can make such a showing even prior to suffering an injury, because the CPA not only vindicates individual rights but protects the public interest. See Scott v. Cingular Wireless, 160 Wash.2d 843, 853, 161 P.3d 1000 (2007); Hangman Ridge, 105 Wash.2d at 785, 719 P.2d 531 ("The purpose of the capacity-to-deceive test is to deter deceptive conduct before injury occurs.") (citing Jeffrey M. Koontz, Recent Development, Washington Lawyers Under the Purview of the State Consumer Protection Actthe "Entrepreneurial Aspects" Solution, 60 Wash. L.Rev. 925, 944 (1985)). This protection of the public interest extends to misrepresentations made to one person, where those misrepresentations have the capacity to deceive a substantial portion of the publicfor example, if they are made in a standard form contract. See, e.g., Potter v. Wilbur-Ellis Co., 62 Wash.App. 318, 327-28, 814 P.2d 670 (1991).
[5] The majority cites over 50 cases in which federal courts declined to certify a class based on Fed.R.Civ.P. 23 where multiple state laws applied. Majority at 935-36. But this list of cases, devoid of detail or discussion, merely supports the obvious proposition that under some facts, application of numerous state laws can defeat class certification. There is no need to counter in kind to cite to the equally obvious corollary that under some facts the potential application of multiple state laws can be managed, and class certification is warranted.
[6] The majority provides no basis for its insinuation that a class is waiting in every state to file a statewide class action suit now that the majority is dissolving the nationwide class action here. A nationwide class provides no risk that the consumers of any states will be left behind.
[7] The majority opines that granting class certification here would force Washington to "become a locus for nationwide class action litigation." Majority at 932. But perhaps it should, where the litigation involves the conduct of a Washington corporation stemming from corporate decision making occurring in this state.
[8] These representations include those made in advertising and discussions prior to the contract, those made in the contract, and those made post-contract in response to customer inquiries.
[9] To the extent AT & T branch offices in other states offered and accepted the contracts with customers, the AT & T headquarters would have provided them the authority to do so under the representations and omissions challenged here.
[10] The CPA claims also include allegations of omissions. To the extent AT & T decided to omit information or failed to provide information it should have to consumers, those decisions or oversights would be attributable to decisions made at AT & T's headquarters in Washington.
[11] Although the statutory language here is clear, ambiguity would be liberally resolved with a construction that effectuates the CPA's purposes, including the fostering of fair and honest competition. See RCW 19.86.920.
[12] The trial court must take the plaintiffs' substantive allegations as true for the purpose of class certification. See Cingular Wireless, 160 Wash.2d at 856-57, 161 P.3d 1000 (quoting Smith, 113 Wash.App. at 318-19, 54 P.3d 665).
[13] The majority requires satisfaction of a difficult evidentiary burden since class members are forced to prove a negativethat they did not know the true nature of the UCC. The majority does not explain why it is not sufficient that the plaintiffs allege ignorancea factual allegation that must be taken as true for the purposes of class certification. See Cingular Wireless, 160 Wash.2d at 856-57, 161 P.3d 1000 (quoting Smith, 113 Wash.App. at 318-19, 54 P.3d 665). After class certification AT & T could still put forth evidence that some plaintiffs had additional information concerning the UCC through materials it circulated. The trial court could utilize subclasses or master's hearings to permit a trier of fact to determine whether those materials conveyed the true nature of the charge to its recipients. This method does not wholesale extinguish individuals' ability to bring a class action under the CPA for misrepresentation, as does the majority.